UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

EARNEST TOLBERT,                          )
                                          )
        Plaintiff,                        )
                                          )
        v.                                )     CAUSE NO. 1:09-CV-01348-TWP-TAB
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security           )
Administration,                           )
                                          )
        Defendant.                        )

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Earnest Tolbert ("Tolbert"), requests judicial review of the decision of

Defendant, Michael J. Astrue, Commissioner of the Social Security Administration ("the

Commissioner"), denying Tolbert's application for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").  For the reasons set forth below, the Court **AFFIRMS**

the decision of the Commissioner.

## I. BACKGROUND

Tolbert was 49 years old on the date of his initial application for benefits.  He has a high

school education and has completed special job training at vocational school as an auto

mechanic.  Tolbert's relevant employment history includes work as a mechanic, janitor, security

guard, and truck driver; however, he has not worked since the onset of his impairments.  Tolbert

lives in a house with his mother and wife and requires either their assistance or the use of a cane

to walk.  On a typical day, Tolbert described waking up at around 10:00 a.m., lying down

throughout the day because of his pain, and going to bed at around 4:00 am.

## A.  PROCEDURAL HISTORY

Tolbert filed applications for SSI and DIB on October 6, 2006, alleging that he became disabled in June or July 2006.  Both were denied initially and upon reconsideration.  On January 8, 2009, Tolbert appeared with counsel and testified at a hearing before Administrative Law Judge ("the ALJ") Michael R. McGuire.  On February 27, 2009, the ALJ issued his decision finding Tolbert was not disabled.  On September 9, 2009, the Appeals Council denied review of the ALJ's decision, at which point the ALJ's decision became the final decision of the Commissioner.

## B.  MEDICAL HISTORY

Tolbert was taken by ambulance to the emergency room of Community East Hospital on July 14, 2006.  (R. at 199).  There, he was seen by Stephen R. Johantgen, M.D., who examined Tolbert's complaint of *"[r]ight leg dragging."*  (R. at 199).  Tolbert's wife reported that he had been dragging his leg behind him for a couple of years and claimed that it *"seemed to be getting worse."*  (R. at 199).  Dr. Johantgen observed that Tolbert *"literally does seem to drag his leg behind him, although he can bear some weight."*  (R. at 200).  On examination, Dr. Johantgen found *"no midline tenderness of the spine,"* but noted that Tolbert experienced *"increased pain when putting his hip through a range of motion."*  (R. at 199-200).  Dr. Johantgen further noted Tolbert's reflexes to be *"markedly decreased or absent at the right patellar area or Achilles area,"* his sensation *"absent on that right leg,"* and a *"good distal pulse and good warmth to the entire leg."*  (R. at 200).

Dr. Johantgen later amended his report, adding a nurse's observation that Tolbert *"was able to flex both hips, put his legs down, and push himself up [back in bed] with his legs."*  (R. at 200).  Dr. Johantgen described this as *"certainly more than any strength he had demonstrated to*

*me with that leg,"* adding that this observation and Tolbert's acute alcohol intoxication *"certainly muddies the picture trying to ascertain what is going on."* (R. at 200).

Pursuant to Dr. Johantgen's order, x-rays were taken of Tolbert's right and left hips by Kenyon K. Kopecky, M.D. on July 14, 2006. (R. at 201). The x-ray report listed Tolbert's "indications" as *"hip pain for one year"* (R. at 201) and *"left hip pain for one year."* (R. at 202). Dr. Kopecky's "findings" were that *the joint space is maintained," "the articular surfaces are smooth," "minimal osteophyte is present at the superior, lateral aspect of the acetabulum,"* but that *"the bones are otherwise normal."* (R. at 201, 202). Dr. Kopecky's "impression" was of *"minimal degenerative change"* of the right hip (R. at 201) and "minimal degenerative disease" of the left. (R. at 202).

Tolbert also received an MRI of the lumbar spine, pursuant to Dr. Johantgen's order. (R. at 203). In his July 14, 2006 MRI report, James R. Bognanno, M.D. listed Tolbert's "indication" as *"severe back pain, right leg weakness."* (R. at 203). Dr. Bognanno reported: *"On the axial cuts from L2 through S1, the L2-3, L3-4, and 4-5 disks maintain normal configuration"; "The facet joints show some mild arthritic change at the 4-5 level"; "The L5-S1 level shows normal configuration of the disks";* and *"The facets show mild to moderate arthritic change."* (R. at 203). Further, Dr. Bognanno did not find any *"canal or lateral recess stenosis"; "significant spinal stenosis, lateral recess or foraminal constriction"*; or *"soft disk herniation."* (R. at 203).

On July 15, 2006, Tolbert again visited the emergency room, this time at Wishard Memorial Hospital. (R. at 204). He was seen by David R. Fish, M.D., who diagnosed Tolbert with active sciatica. (R. at 204). Dr. Fish ordered an orthopaedic consultation *"for pain of right hip"* and a physical therapy consultation to *"evaluate and treat [Tolbert's] sciatica."* (R. at 204). Tolbert was prescribed Acetaminophen 650 mg for his pain. (R. at 204).

Tolbert underwent a medical evaluation by Sae Y. Rhee, M.D. at the Circle City Evaluation Center on November 22, 2006. (R. at 207). Dr. Rhee described Tolbert's complaints as *"pain in the lower back with numbness in the right leg and pain in both hips,"* noting that Tolbert has been complaining of pain in both hips and lower back for three years. (R. at 207). On examination of Tolbert, Dr. Rhee found: *"No tenderness and no muscle spasm of the back"*; *"no deformities or tenderness in the hips"*; and *"some limitation of the range of motions of the back."* (R. at 207). Dr. Rhee also found Tolbert's deep tendon reflexes to be *"absent in the right ankle area,"* and his peripheral pulsations to be *"normal and equal bilaterally."* (R. at 207). Additionally, Dr. Rhee reported *"minimal hypoesthesia in the right leg"* and described Tolbert's gait as *"slow with slightly limping while using cane."* (R. at 207). Ultimately, Dr. Rhee assessed Tolbert with *"chronic low back pain syndrome with history of lumbar disc disease"* and *"history of hip osteoarthritis in both hips."* (R. at 207).

On December, 13, 2006, following his application for DBI and SSI benefits, J.V. Corcoran, M.D. reviewed Tolbert's claim file and completed a Physical Residual Functional Capacity Assessment form for the state agency (R. at 210). Based on the July 14, 2006 MRI (R. at 211), Dr. Corcoran's "primary diagnosis" of Tolbert's impairment was "sciatica"; his secondary diagnosis was *"minimal degenerative change in hips."* (R. at 210).

Dr. Corcoran found Tolbert to be physically able to: *"Occasionally lift and/or carry 20 pounds"*; *"Frequently lift and/or carry 10 pounds"*; *"Stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday"*; *"Sit (with normal breaks) for a total of about 6 hours in an 8-hour workday"*; *"Push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry"* (R. at 211); and *"Occasionally climb, balance, stoop, kneel, crouch, and crawl."* (R. at 212). No manipulative,

visual, communicative, or environment limitations were established. (R. at 213). Dr. Corcoran described Tolbert's gait as *"slow with slightly limping while using cane,"* adding that Tolbert uses a cane *"because of balancing problem."* (R. at 211). Tolbert's lumbar forward flexion was *"60 degrees, his extension 10 degrees, and his lateral flexion 15 degrees bilaterally."* (R. at 211).

Dr. Corcoran concluded that Tolbert's allegations regarding the nature and severity of the impairment-related symptoms and functional limitations were partially credible. (R. at 215). The nature of Tolbert's alleged symptoms found support within the evidence, but Tolbert's contentions regarding the severity of, and the related functional restrictions, did not. (R. at 215). Dr. Corcoran therefore found Tolbert's RFC assessment to be more consistent with the evidence than Tolbert's allegations. (R. at 215). On April 3, 2007, Bruce Whitley, M.D. affirmed the file as written.

On April 5, 2007, Tolbert underwent a psychological evaluation by Greg V. Lynch, Ph.D. (R. at 219). Tolbert's chief complaint was reported as *"back, hips, legs, and neck problems."* (R. at 219). Tolbert further stated that he smoked two packs of cigarettes a day, drank beer occasionally, and had been arrested four times – for DUI, public intoxication, and assault. (R. at 220). Dr. Lynch listed moderate psychosocial stressors in his diagnostic impression and concluded that Tolbert was capable of managing benefits adequately if awarded. (R. at 223). Dr. Lynch also determined Tolbert's prognosis for improvement to be *"fair with or without mental health intervention."* (R. at 223). Additionally, F. Kladder, Ph.D. completed a psychiatric review of Tolbert on April 19, 2007, finding *"[n]o medically determinable impairment."* (R. at 224).

On November 12, 2008, Vada Durr-Stein, M.D., performed a physical capacities evaluation of Tolbert. (R. at 238). Dr. Durr-Stein diagnosed Tolbert with osteoarthritis of bilateral hip and spine and listed his prognosis as fair. (R. at 238). The doctor also concluded that *"Tolbert is able to tolerate sitting but is unable to sustain any significant standing, walking, climb[ing] or carrying [weights greater than] 5 lbs continuously."* (R. at 238).

In a "Physical Capacities Evaluation" form, Dr. Durr-Stein reported Tolbert's specific capabilities as follows: In an 8-hour workday, he can sit 8 hours, stand 3 hours, and walk 3 hours (total at one time); he can lift up to 5 lbs continuously, 6-25 lbs occasionally, but never 26-100 lbs; he can carry up to 5 lbs continuously, 6-20 lbs occasionally, but never 21-100 lbs; he can use both hands for repetitive action such as simple grasping and pushing and pulling of arm controls; he cannot use either hand for repetitive action such as fine manipulation; he can use his left foot for repetitive movements such as in pushing and pulling of leg controls, but not his right foot; he is able to bend, squat, climb, reach, stoop, and balance occasionally, but he is never able to crawl or crouch; he has no activity restrictions involving being around moving machinery, exposure to marked changes in temperature and humidity, or exposure to dust, fumes, and gases; he has mild activity restrictions involving driving automobile equipment; and he has total restriction on activities involving unprotected heights. (R. at 239).

Tolbert saw Dr. Durr-Stein again on April 14, 2008. (R. at 246). Dr. Durr-Stein ordered an orthopaedic consultation for Tolbert's *"hip and low back pain and decreased ROM of right hip."* (R. at 246). The doctor also ordered a spinal lumbar MRI for Tolbert's *"persistent hip and back pain with associated numbness and decreased ROM,"* but noted, *"Patient does not have severe back pain."* (R. at 247). Tolbert made additional visits to Dr. Durr-Stein on October 7, 2008 (R. at 247) and November 12, 2008 (R. at 248), yielding no significant findings.

On May 13, 2008, Tolbert received an MRI by Darren O'Neill, M.D. (R. at 247). Dr. O'Neill found *"the lumbar vertebrae remain in normal alignment; the vertebral body heights and intervertebral disc spaces remain relatively well-maintained; and no focal abnormal bone marrow signal intensity."* (R. at 247). The doctor also noted a *"[s]mall T1/T2 hypertinse hemangioma…within the posterior L5 vertebral body."* (R. at 247). Tolbert's cons medullaris appeared normal and there were *"no significant patavertebral soft tissue abnormalities."* (R. at 247). Dr. O'Neill's ultimate impression was of *"[s]table minimal lumbar spine degenerative disease…without significant spinal stenosis, neuroforaminal compromise, or nerve root impingement."* (R. at 247).

## C. THE ADMINISTRATIVE HEARING

### 1. **Tolbert's Testimony**

At the hearing held on January 8, 2009, Tolbert testified that he had previously worked as an auto mechanic, a janitor, a truck driver, and a security guard. (R. at 35-36, 38). Tolbert described his past employment as a security guard by simply stating, *"We just made rounds."* (R. at 39). Tolbert allegedly became disabled on July 2, 2006 and has not worked since. (R. at 39).

Tolbert testified that he experiences constant pain in his lower back, which worsens during cold weather or if he bends or reaches quickly. (R. at 40). Tolbert described his current level of pain as a seven out of ten, but added that it is typically a level eight or nine. (R. at 42). Tolbert further stated that the pain travels left and right depending on how he is sitting or lying. (R. at 42). Tolbert also testified to pain in his right hip and described numbing in his leg that sometimes causes his leg to go out from under him. (R. at 43). This causes Tolbert to fall, which is why he walks with a cane. (R. at 43).

On questioning by the ALJ, Tolbert testified that he could walk about a block without stopping and stand for about forty-five minutes in reasonable comfort. (R. at 41). On later examination by his attorney, Tolbert testified that he had to stop three times that day while walking one-quarter of a block. (R. at 46). Tolbert's attorney also sought clarification on Tolbert's prior statements that he is able to stand for only ten minutes, which Tolbert testified was *"true overall."* (R. at 46). Tolbert further testified that he can only sit for *"so long"* before he has to lie down, and that he then has to get back up. (R. at 41). Tolbert stated that his pain medication works when he is lying down, but when he gets up he has to take more medication to offset the pain. (R. at 44). Tolbert testified that he has trouble with balance after he gets up and that he uses a walker when he goes to the bathroom. (R. at 40). Tolbert later explained that he does not use the walker outside of the house, only the cane. (R. at 48-49).

Tolbert testified that on a typical day, he wakes at 10:00 a.m. and goes to bed at 3:00 a.m. or 4:00 a.m. (R. at 44). He further stated that he spends his day either taking pills or lying down. (R. at 44). Tolbert stated that he is able to do some chores, such as washing dishes, and mopping and sweeping the floor, but nothing more. (R. at 44). He also stated that he is able to drive, which causes problems when he has to park far away and walk. (R. at 45). Tolbert testified that stairs were a challenge and that he usually takes the elevator, adding that because of the pain in his leg, he is *"dog tired"* by the time he gets halfway up a set of stairs. (R. at 45).

## 2. Vocational Expert's Testimony

The vocational expert ("VE"), Julie Bose, testified that Tolbert's past work as an unarmed security guard is considered light in physical demand and at the low end of semi-skilled. (R. at 52). The VE described the job as typically consisting of being at a station where

one can sit or stand at will, with rounds being made for about five minutes every hour. (R. at 53). The lifting demands of this position do not exceed five pounds. (R. at 53).

When questioned regarding a hypothetical person of Tolbert's age, education, and vocational background, the VE testified that a person could perform as an unarmed security guard if that person could: lift or carry twenty pounds occasionally and five pounds frequently; stand, walk, or sit for six hours in an eight hour day, with the option to sit or stand at will; push or pull twenty pounds; and bend, squat, climb, reach and stoop occasionally. (R. at 53-54). However, the VE also testified that this and all other jobs would be eliminated if it were assumed that this person would have to lie down occasionally throughout the day due to pain. (R. at 54).

Upon questioning by Tolbert's attorney, the VE testified that there would be no jobs that the hypothetical person could do if his standing was limited to one hour in an eight hour day, if he could lift only five pounds, if he could not perform fine manipulation with his hands, if he could not use his feet for pushing or pulling leg controls, if he cannot crawl or crouch, and if he required the use of a walker or a cane to ambulate. (R. at 54-57).

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for SSI and DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

> 1.     If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2.      If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3.      If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4.      If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5.      If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps; it then shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become the findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th

Cir. 1994).  Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz*, 55 F.3d at 307.  An ALJ's articulation of his analysis "aids [the Court] in [its] review of whether the ALJ's decision was supported by substantial evidence." *Scott v. Heckler*, 768 F.2d 172, 179 (7th Cir. 1985).

## III. <u>DISCUSSION</u>

### A.  THE ALJ'S FINDINGS

As reported in his decision, the ALJ found that Tolbert met the disability insured status requirements of the Social Security Act through June 30, 2007 (R. at 10), and that Tolbert had not engaged in substantial gainful activity since his alleged onset date of July 2, 2006.  (R. at 10).  The ALJ also found that Tolbert had degenerative disc disease and bilateral hip osteoarthritis, impairments that would significantly limit Tolbert's ability to perform basic work-related activities.  (R. at 10).  Tolbert's impairments were not found, however, to meet or medically equal any of those listed in the regulations' Listing of Impairments (R. at 10); the ALJ gave particular consideration to Listings 1.02 and 1.04 (R. at 10-11).  The ALJ further found that Tolbert has the residual functional capacity ("RFC"), to perform a reduced range of light work consistent with the following capabilities: occasionally lifting twenty pounds and frequently lifting five pounds; sitting/standing/walking six hours with a sitting/standing option at will; pushing and pulling twenty pounds; and occasional bending, squatting, climbing, reaching, and stooping.  (R. at 11).  In making the above determinations, the ALJ found that Tolbert's allegations concerning the intensity, persistence, and limiting effects of his symptoms were not credible.  (R. at 14).  Based on Tolbert's assessed RFC, ALJ ultimately found Tolbert capable of performing his past relevant work as a security guard and therefore not disabled.  (R. at 16).

## B. TOLBERT'S ARGUMENTS ON APPEAL

Tolbert makes three primary arguments on appeal.  First, Tolbert argues that the ALJ erred at his step three determination that Tolbert's impairments do not meet or equal any impairment that appears in the Listing of Impairments.  Second, Tolbert argues that the ALJ's negative credibility determination was patently erroneous.  Third, Tolbert argues that substantial evidence fails to support the ALJ's step four determination that Tolbert is physically capable of performing the duties of his past employment.  Each argument is addressed in turn below.

## 1.  Listing of Impairments

Tolbert first argues error at step three of the sequential evaluation process.  Step three requires an ALJ to consider the medical severity of a claimant's impairments in light of the regulations' Listing of Impairments.  20 C.F.R. 404.1520(a)(4)(iii).  If a claimant's impairments satisfy the duration requirement and meet or equal a listed impairment, the claimant will be found disabled.  20 C.F.R. 404.1520(d).  Tolbert asserts numerous errors at step three and directs the Court's attention to Listings 1.02A and 1.04A, both of which are addressed in the ALJ's decision.

### a.  Listing 1.02 – Major Dysfunction of a Joint

Listing 1.02A characterizes major dysfunction of a joint as:

[G]ross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings…of joint space narrowing, bony deconstruction or ankylosis of the affecting joint.  With Involvement of one major peripheral weight-bearing joint resulting in inability to ambulate effectively as defined by 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.02(A). Tolbert argues that the ALJ ignored three pieces of evidence that prove Tolbert's impairments meet or equal listing 1.02A, none of which warrant remand.

Tolbert first claims that the ALJ failed to consider Tolbert's use of a cane for balance in determining whether Tolbert can ambulate effectively. Listing 1.00B2b(1) defines "ineffective ambulation" as having "insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device that limits the functioning of both upper extremities." § 1.00(B)(2)(b)(1). As examples of such a device, the listing offers "a walker, two crutches or two canes." *Id.*

Contrary to Tolbert's assertion, the ALJ did consider Tolbert's use of a cane in his Listing 1.02 analysis. ALJ found *"no evidence establishing an inability to ambulate effectively as defined by 1.00B2b,"* despite acknowledging Tolbert's testimony that *"he uses a cane outside and a walker while in the house."* (R. at 11). A single cane does not constitute a "hand-held assistive device" under the listing, as it does not limit the functioning of both upper extremities. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.00B2b(1); *see also* § 1.00(B)(2)(b)(2) (further illustrating ineffective ambulation as "the inability to walk without the use of a walker, two crutches or two canes"). *Id.* (emphasis added). Therefore, the ALJ's conclusion is correct. Additionally, Tolbert's use of a single cane outside the home illustrates that Tolbert is not dependent on a walker to ambulate effectively. There is no error in ALJ's conclusion that Tolbert *"does not require a walker."* (R. at 11).

Tolbert next claims that under Listing 1.02, the ALJ failed to consider two statements contained in Dr. Johantgen's July 14, 2006 emergency room report that are indicative of his inability to ambulate effectively: (1) *"[Tolbert's] wife says he has been dragging his leg behind*

*him for a couple of years, but it seems to be getting worse;"* and (2) *"[Tolbert] was able to crawl into the house without any problems."* (R. at 199).

"[A]n ALJ may not ignore an entire line of evidence that is contrary to [his] findings." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). However, it is firmly established that an ALJ need not address every piece of evidence presented. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). All that is required is that an *"ALJ sufficiently articulate his assessment of the evidence"* to assure a reviewing court *"that the ALJ considered the important evidence and to enable [the court] to trace the path of the ALJ's reasoning." Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Under this standard, evidence that is corroborative or redundant does not constitute a separate line of evidence and need not be addressed by the ALJ specifically. *Briscoe v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005) (citing *Carlson*, 999 F.2d at 181); *see also Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996).

The statements asserted by Tolbert do not constitute a separate line of evidence. Although the ALJ did not specifically discuss Tolbert's wife's statement, the ALJ did discuss Dr. Johantgen's personal observation that Tolbert appears to drag his leg. (R. at 14). Moreover, the ALJ explained his reasoning for according less weight to the doctor's observation. (R. at 14). In light of this analysis, Tolbert's wife's statement provides redundant evidence, and the ALJ's omission of it is harmless. Additionally, there is overwhelming evidence, including Tolbert's own testimony (R. at 14), that Tolbert's mobility is not reduced to a crawl. The ALJ's failure to specifically address this statement is, therefore, not cause for remand.

Tolbert's final claim regarding Listing 1.02A is that the ALJ erroneously rejected portions of Dr. Johantgen's report that allegedly indicate Tolbert's inability to ambulate effectively. Dr. Johantgen observed, *"[Tolbert] does attempt to get up and walk, but literally*

*does seem to drag his leg behind him"*; he also reported Tolbert's reflexes to be *"markedly decreased or absent at the right patellar area or Achilles area"* and that sensation was *"absent on that right leg."* (R. at 200).

The regulations provide that controlling weight be given to the medical opinions of treating physicians; however, this is only required if the opinions are supported by medical findings consistent with substantial evidence in the record. *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). An ALJ may discredit a treating physician's opinion, provided that the ALJ minimally articulates his reasons for doing so. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Here, the ALJ provides sound reasoning for discrediting Dr. Johantgen's observations and findings (R. at 14), as is further discussed below regarding Tolbert's credibility assessment.

### b. Listing 1.04 – Disorders of Spine

With respect to Listing 1.04, Tolbert argues that the ALJ ignored and mischaracterized medical evidence in determining that Tolbert was not disabled. Listing 1.04A addresses:

> Disorders of the spine…resulting in compromise of a nerve root or the spinal cord. With [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss…accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test….

20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.04(A). Tolbert asserts numerous pieces of evidence in support of his claims, none of which warrant remand.

Tolbert first claims that the ALJ failed to consider the July 16, 2006 emergency room report, in which Dr. Fish clinically diagnosed Tolbert with sciatica. (R. at 204). Sciatic pain "is a specific type of the radicular pain required by Listing 1.04(A)." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (citing Ari Ben-Yishay, M.D., *Low Back Pain and Sciatica: Radicular Pain*, Spine-Health, http://www.spine-health.com/topics/cd/hurt/h04.html (last visited February

25, 2011).   However, the term sciatica *"describes where the pain is felt"; "[it] is not an actual diagnosis."* Ben-Yishay, M.D., *supra*.  This distinction is evident in Tolbert's emergency room report, where Dr. Fish's stated, *"The pain of sciatica...is caused by irritation of the sciatic nerve...[and] can be due to a herniated disk in the spine..."*.  (R. at 205).

Although the ALJ does not address Dr. Fish's finding directly, the ALJ acknowledges Tolbert's sciatica diagnosis as it was reported to Dr. Rhee during Tolbert's DDS evaluation on November 22, 2006.  (R. at 12).  Moreover, the ALJ addresses Tolbert's "chronic back pain" in his analysis (R. at 10), concluding that it *"does not rise to the level of severity as required by [Listing 1.04A]."*  (R. at 11).

Tolbert similarly claims that the ALJ ignored other medical evidence indicating Tolbert's disability under Listing 1.04.  Specifically, Tolbert points to: (1) Tolbert's symptoms of *"severe back pain, right leg weakness,"* as listed by Dr. Bognanno in the July 14, 2006 MRI report (R. at 204);  (2) Tolbert's complaints of *"pain in the lower back with numbness in the right leg and pain in both hips,"* as recorded by Dr. Rhee during the November 22, 2006 medical consultation (R. at 207); (3) the orthopedic consultation ordered by Dr. Durr-Stein on April 14, 2008 to address Tolbert's *"hip and low back pain and decreased ROM of right hip"* (R. at 246); and (4) Tolbert's *"back, hip, legs, and neck problems,"* as reported by Dr. Lynch during the April 5, 2007  psychological evaluation. (R. at 219).

As discussed above, there is no error in an ALJ's failure to specifically consider redundant or corroborative evidence.  Here, the ALJ clearly acknowledges Tolbert's chronic hip and back pain (R. at 10), rendering harmless any omission by the ALJ to this effect.  Further, an ALJ may discount a treating physician's opinion if it is merely a recitation of a claimant's subjective complaints.  *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  The portions of the

medical records highlighted above reflect statements made by Tolbert regarding his symptoms, not the medical findings of Tolbert's physicians. Simply stated, the omissions highlighted by Tolbert are not erroneous.

Tolbert further claims the ALJ mischaracterized medical evidence in his Listing 1.04 analysis by including limiting language in his discussion of it. An ALJ may not mischaracterize evidence of a disability that contradicts the ALJ's ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 916-17 (7th Cir. 2003).

First, Tolbert challenges the ALJ's characterization of the July 14, 2006 MRI. The ALJ states that the MRI "*only revealed mild to moderate L4-5 and L5-S1 facet arthritic changes*" (emphasis added) and that it "*was unremarkable otherwise as there was no spinal stenosis, soft disk herniation, or compression.*" (R. at 12 (emphasis added)). Tolbert claims the impairments noted to be absent by the ALJ were never suggested as a problem by Tolbert's physician, and that the ALJ minimized the MRI's actual arthritic findings by adding the word "only."

Contrary to Tolbert's assertions, the impairments noted absent by the ALJ are specifically considered disabling under Listing 1.04. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 1.04(A). Listing 1.04 includes "herniated nucleus pulposus" and "spinal stenosis" as examples of disabling spinal disorders, and nerve root compression is required to satisfy the listing. *Id.* These disorders are common causes of radiculopathy from the spine, for which the MRI was ordered (R. at 200), and their absence is explicitly noted by Dr. Bognanno in the report. (R. at 203). Further, the ALJ's addition of the word "only" to describe the MRI's results is not misleading. Tolbert's L4-5 and L5-S1 facet arthritic changes were Dr. Bognanno's ultimate "impression" from the MRI, and there are no additional "findings" in the report that indicate disability. (R. at 203).

Tolbert's claim regarding the ALJ's characterization of the May 13, 2008 MRI fails for identical reasons. The ALJ states that this MRI *"revealed normal alignment, relatively well-maintained disc spaces, no abnormal bone marrow, no significant paravertebral soft tissue abnormalities and only minimal degenerative face changes without spinal stenos* [sic] *or neuroforaminal compromise at L3-4, L4-5, and L5-S1."* (R. at 12 (emphasis added)). Although Dr. O'Neill does report a *"[s]mall T1-T2 hypertinse hemangioma…within the posterior L5 vertebral body"* (R. at 247), this impairment is not within the scope of Listing 1.04. Furthermore, Dr. O'Neill's ultimate "impression" was of *"[s]table minimal multilevel lumbar spine degenerative changes…without significant spinal canal stenosis, neuroforaminal compromise, or nerve root impingement."* (R. at 247). The ALJ's addition of the word "only" is an accurate reflection of this conclusion.

Tolbert also challenges the ALJ's characterization of the July 14, 2006 x-ray report. The ALJ states that the x-rays *"confirmed no fracture and dislocations and only showed minimal degenerative disease in both hips."* (R. at 13 (emphasis added)). Tolbert claims the ALJ's addition of the word "only" ignores the presence of *"[m]inimal osteophyte"* (R. at 201, 202), which Tolbert speculates *"was probably the cause of [his] hip pain."* (Pl.'s Br. at 13). Yet Dr. Kopecky merely lists the osteophyte formation in his x-ray "findings" (R. at 201, 202); his ultimate "impression" was *"minimal degenerative changes"* (R. at 201, 202). The ALJ's addition of the word "only" does not mischaracterize this conclusion. Moreover, the doctor made no connection between the osteophyte findings and Tolbert's hip pain. For the ALJ to speculate to this conclusion, as Tolbert urges him to do, would have indeed been a mischaracterization of the evidence.

Tolbert next claims that the ALJ selectively considered evidence from Dr. Durr-Stein's November 12, 2008 evaluation, ignoring evidence establishing Tolbert's limited abilities. Tolbert specifically points to Dr. Durr-Stein's conclusion that *"Tolbert is able to tolerate sitting but is unable to sustain any significant standing, walking, climb[ing] or carrying [weights greater than] 5 lbs continuously."* (R. at 238). The regulations allow an ALJ to assess the weight that a treating physician's opinion deserves by examining whether his opinion was internally inconsistent and consistent with the other objective medical evidence. *Simila*, 573 F.3d at 218.

Tolbert's claim finds no support in the ALJ's decision; the ALJ addresses in detail his reasons for selectively considering portions of Dr. Durr-Stein's report. The ALJ states, *"[T]he treating physician's RFC contains contrary statements concerning the claimant's ability to sit, stand and walk."* (R. at 15). Specifically, Dr. Durr-Stein states that Tolbert is *"able to tolerate sitting but is limited to any significant standing or walking."* (R. at 238). However, Dr. Durr-Stein later indicates that Tolbert *"can sit for 8 hours at one time and stand or walk for 3 hours at one time"* (R. at 15, *see* R. at 239), and even later, that Tolbert is *"limited in total to sitting 1 hour and standing or walking 7 hours in an 8 hour day."* (R. at 15, *see* R at 239).

### c. Updated Medical Consultation

Tolbert next argues that the ALJ failed to summon a medical advisor at step three, resulting in the ALJ's erroneous finding that Tolbert did not have any impairment or combination of impairments that met or equaled any that appear in the Listing of Impairments. When an ALJ finds that a claimant's impairments do not medically equal any listing, the ALJ is required to receive and consider expert opinion evidence to that effect. SSR 96-6p. Here, this requirement was satisfied by the SSA-831-U5 forms completed by Dr. Corcoran (R. at 60-61)

and Dr.Whitley (R. at 62-63).  SSR 96-6p.  However, Tolbert claims that the ALJ could not have reasonably relied on these evaluations because they did not consider Tolbert's subsequent treatment in 2007 and 2008 or the functional capacity evaluation of Dr. Durr-Stein.  (R. at 238-39).

The evidence cited by Tolbert does not warrant an updated opinion.  SSR 96-6p requires an ALJ to secure an additional opinion when the ALJ believes that new evidence might cause the initial opinion to change.  SSR 96-6p.  As described above, the medical opinions issued subsequent to the state agency evaluations provide no new lines of evidence, and the ALJ explains in detail his reasons for discrediting Dr. Durr-Stein's evaluation.  A change of opinion is therefore unlikely and Tolbert's claim is not cause for remand.

## 2.  Credibility Assessment

Tolbert's second argument is that the ALJ did not properly assess Tolbert's credibility under SSR 96-7p.  Upon finding an impairment that could reasonably be expected to produce a claimant's symptoms, an ALJ must *"evaluate the intensity, persistence, and functionally limiting effects of the symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities."*  SSR 96-7p.  This requires the ALJ to assess the credibility of the claimant's statements regarding the symptoms and their functional effects.  *Id*.  Tolbert makes two claims regarding the ALJ's credibility determination, one general and one specific.

Tolbert claims generally that the ALJ improperly relied on an absence of objective medical evidence in determining Tolbert's credibility, and he further asserts that the ALJ failed to consider the additional factors for assessing the credibility of subjective statements outlined by SSR 96-7.  "The absence of objective medical evidence supporting an individual's statements

about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility." SSR 96-7.

Here, the ALJ clearly did not require objective medical evidence to support Tolbert's testimony; the SSR 96-7 factors were properly considered. The ALJ does acknowledge the absence of *"sufficient objective medical evidence"* (R. at 13), but the ALJ goes further, determining that Tolbert's subjective statements regarding the severity of his symptoms were not credible based on inconsistencies among the statements themselves. (R. at 13). The ALJ concluded that Tolbert's daily activities were *"not limited to the extent one would expect, given the complaints of disabling symptoms and limitations"* (R. at 13), emphasizing Tolbert's ability to do some chores, to drive, and to do lawn work. (R. at 13). The ALJ further found Tolbert's testimony that he had not worked since the alleged onset date to be inconsistent with Tolbert's disclosure that he had performed lawn work as an odd-job after his onset date. (R. at 13). Similarly, the ALJ cites Tolbert's conflicting testimony about his ability to walk short distances. (R. at 14-15).

Moreover, the ALJ recognized statements by a treating physician that suggest Tolbert was engaging in *"possible malingering or misrepresentation."* (R. at 14). In his July 14, 2006 emergency room report, Dr. Johantgen transcribed a nurse's observation that Tolbert *"was able to flex both hips"* and *"put his legs down and push himself up on the legs."* (R. at 14, 200). The doctor added that it *"was certainly more than any strength [Tolbert] had demonstrated to me with that leg"* and that this incident, along with Tolbert's intoxication at the time, *"certainly muddies the picture trying to ascertain what is going on."* (R. at 14, 200).

Tolbert also claims, specifically, that the ALJ erroneously considered Tolbert's failure to obtain treatment in his credibility determination. A claimant's statements may be given less

credence if "the level or frequency of treatment is inconsistent with the level of complaints." However, the ALJ must inquire as to the reasons for the inconsistency before drawing inferences about the claimant's symptoms and their functional effects. SSR 96-7p.

Tolbert's assertion is correct; the ALJ did not provide the requisite inquiry as to why Tolbert did not seek additional medical treatment for his impairments. The ALJ states only that Tolbert *"received virtually no treatment for his disabling pain, other than the two emergency room visits"* (R. at 14), and no further information was requested during Tolbert's testimony. However, *"[i]t is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong' and deserving of reversal." Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). Here, Tolbert's failure to seek treatment is not the only basis for the ALJ's credibility determination. The ALJ considers various factors in his assessment and properly articulated their role in discrediting the severity of Tolbert's alleged symptoms. The totality of this evidence therefore renders the ALJ's error harmless.

**3.** **Past Employment**

Finally, Tolbert argues that the ALJ erroneously determined that Tolbert could perform his previous job as security guard, which resulted in the finding at step four that Tolbert was not disabled. At step four in the sequential evaluation process, an ALJ must determine whether a claimant has the capacity to perform a past relevant job based on the following elements: (1) a finding of fact as to the individual's RFC, (2) a finding of fact as to the physical and mental demands of the past job/occupation, and (3) a finding of fact that the individual's RFC would permit a return to his or her past job or occupation. SSR 82-62p. Tolbert asserts error with all three of these elements.

### a. RFC Determination

Tolbert first claims that the ALJ's RFC determination is erroneous because it is inconsistent with the regulations' definition of "light work." At issue is the ALJ's conclusion that Tolbert can frequently lift five pounds (R. at 15), while the regulations classify "light work" as the ability to frequently lift ten pounds. 20 C.F.R 404.1567(b). Tolbert's assertion, however, mischaracterizes the ALJ's RFC findings. The ALJ described Tolbert's RFC as a "*reduced range* of light work" (R. at 16 (emphasis added)), which, as qualified, is consistent with the regulations' "light work" classification. Moreover, Tolbert's assertion applies a flawed understanding of the disability evaluation process. The regulations do not require consistency between Tolbert's RFC and the physical exertion classifications; they require only that Tolbert's RFC enables him to perform his past relevant work. 20 CFR 404.1520(a)(4)(iv). Tolbert's claim is therefore without merit.

Tolbert further claims the ALJ erred in his RFC determination because it is contrary to the evaluation opinion of Dr. Durr-Stein. However, as described above, the ALJ discusses in detail the basis of his RFC determination, including an analysis of Dr. Durr-Stein's opinion and an explanation for the lesser weight accorded to it. (R. at 15).

### b. Duties of Past Employment

Tolbert next claims the ALJ failed to make findings of fact regarding the physical and mental demands of Tolbert's past employment. SSR 82-62 requires that an ALJ's decision specifically set forth these findings so as to allow for meaningful review of the ALJ's step four determination. SSR 82-62; *Getch v. Astrue*, 539 F.3d 473, 481(7th Cir. 2008). Relying on *Nolen v. Sullivan*, 939 F.2d 516 (7th Cir. 1984), Tolbert asserts that the ALJ generically described Tolbert's past security guard position as "light work," without inquiring into any differences in

duties between that job and other light work positions. *Id.* at 518; *see also Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir. 1984); *Smith v. Barnhart,* 388 F.3d 251, 252-53 (7th Cir. 2004).

*Nolen* has been construed more narrowly than as applied by Tolbert. *See Cohen v. Astrue*, 258 Fed. Appx. 20, 28 (7th Cir. 2007) (citing *Barnhart*, 388 F.3d at 252-253). Under *Nolen*, "an ALJ cannot describe a previous job in a generic way, e.g., 'sedentary,' and on that basis conclude that the claimant is fit to perform all sedentary jobs without inquiring into any differences in what the job requires while sitting." *Id.* This principle is inapplicable where an ALJ considered the claimant's specific job and there is evidence in the record as to the duties of that job. *Id.*

The ALJ's description of Tolbert's past work was not erroneously generic; the ALJ considered Tolbert's specific work as a security guard, as described by the VE. *See Metzger v. Astrue*, 263 Fed. Appx. 529, 533 (7th Cir. 2008) (finding sufficient an ALJ's reliance on vocational expert's testimony describing the duties of claimant's past work). Although the ALJ's decision only cites the VE's testimony generally, including the VE's conclusion that security guard constituted *"semi-skilled/light work"* (R. at 16), the duties of this position were sufficiently developed in the record. The VE testified, *"Typically the job consists of being at a station where one can sit or stand at will, but they do have to make rounds approximately every five, for five minutes in every one hour."* (R. at 53). Further, *"The only lifting required is a key clack, which weighs less than five pounds."* (R. at 53).

Additionally, the ALJ specifically cited the definition of security guard found in the Dictionary of Occupational Titles (DOT). (R. at 16). SSR 82-61 permits an ALJ to rely upon the DOT descriptions to define a claimant's past employment as it is *"usually performed in the*

*national economy."* SSR 82-61. The duties described in DOT's definition of security guard include periodic patrolling of buildings and grounds, and watching for and reporting irregularities. DICOT 372.667-034. Moreover, the DOT definition, as well as the VE's description, is consistent with Tolbert's testimony concerning his security guard work. Tolbert stated simply, *"We just made rounds."* (R. at 39). Although the ALJ's decision does not include the specific duties listed in this definition, its reference sufficiently enables the court to analyze the ALJ's reasoning below.

### c. Application of RFC

Lastly, Tolbert claims that the ALJ erroneously concluded that Tolbert's RFC would allow Tolbert to return to his past employment as a security guard. This claim stems from the ALJ's alleged failure to describe the duties of Tolbert's past employment. Here, Tolbert again relies on *Nolen*, asserting that without articulating a security guard's duties, there is no basis from which the ALJ can logically conclude that Tolbert can perform those duties with his given RFC. *Nolen*, 939 F.2d at 519. However, as described above, the ALJ sufficiently articulated the VE's testimony and the DOT as the basis for analyzing Tolbert's past work. A review of the duties and physical demands described therein, alongside Tolbert's determined RFC, yields no error in the ALJ's step four determination that Tolbert is not disabled.

## IV. CONCLUSION

For the reasons stated herein, this final decision of the Commissioner of Social Security in this case is **AFFIRMED**. Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: 03/11/2011

Distribution attached.

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, pearlie.wadlington@usdoj.gov, lin.montigney@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com, yvette@mulvanylaw.com, meagan@mulvanylaw.com